CLERK'S OFFICE U.S. DISTRICT COURT AT
ROANOKE, VA
FILED
9/23/2025
LAURA A. AUSTIN, CLERK
BY: s/C. Kemp
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
DANVILLE DIVISION

| | | |
|---|---|---|
| ROBIN R., | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 4:24-cv-00026 |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | By:  Hon. Thomas T. Cullen |
| SECURITY, | ) |      United States District Judge |
| | ) | |
| Defendant. | ) | |

Plaintiff Robin R. ("Robin") filed suit in this court seeking to overturn the Commissioner of Social Security's ("Commissioner") final decision denying her claim for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401–433. Robin suffers primarily from debilitating back pain, fibromyalgia, migraines, and depression. After a hearing, an administrative law judge ("ALJ") concluded that, despite her limitations, Robin could still perform a range of light work. Robin challenges that conclusion, calling for reversal and remand on three primary grounds. Because the ALJ failed to address Robin's mental impairments in her residual functional capacity ("RFC") analysis in a manner that enables this court to review her ultimate conclusion, remand is appropriate.

## I.    STANDARD OF REVIEW

The Social Security Act (the "Act") authorizes this court to review the Commissioner's final decision that a person is not entitled to disability benefits. 42 U.S.C. § 405(g); *see also Hines v. Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The court's role, however, is limited; it may not "reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment"

for that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012) (internal quotation omitted). Instead, in reviewing the merits of the Commissioner's final decision, a court asks only whether the ALJ applied the correct legal standards and whether "substantial evidence" supports the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011); *see Riley v. Apfel*, 88 F. Supp. 2d 572, 576 (W.D. Va. 2000) (citing *Melkonyan v. Sullivan*, 501 U.S. 89, 99–100 (1991)).

In this context, "substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotation omitted). It is "more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review considers the entire record, and not just the evidence cited by the ALJ. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951); *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984). Ultimately, this court must affirm the ALJ's factual findings if "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam) (internal quotation omitted). But "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" within the meaning of the Act if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Social

Security ALJs follow a five-step process to determine whether a claimant is disabled. The ALJ asks, in sequence, whether the claimant: (1) is working; (2) has a severe impairment that satisfies the Act's duration requirement; (3) has an impairment that meets or equals an impairment listed in the Act's regulations; (4) can return to his past relevant work (if any) based on his residual functional capacity ("RFC"); and, if not (5) whether he can perform other work. *See Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th Cir. 2017); 20 C.F.R. § 404.1520(a)(4). The claimant bears the burden of proof through step four. *Lewis*, 858 F.3d at 861. At step five, the burden shifts to the agency to prove that the claimant is not disabled. *See id.*

## II.    RELEVANT PROCEDURAL HISTORY AND EVIDENCE

Robin filed for DIB benefits on April 26, 2021. (*See* R. 42; 112.) She claimed a disability onset date of April 5, 2021, resulting from myriad health issues: fibromyalgia; severe back issues; brain fog; depression; irritable bowel syndrome; migraines; hiatal hernia; bad acid reflux; inability to sleep at night or stay awake in the daytime; and arthritis. (*See* R. 246.) Her claims were denied initially on October 18, 2021 (R. 112–21), and upon reconsideration on July 21, 2022 (R. 122–32).

Robin requested a hearing before an ALJ. (R. 149–50.) On August 23, 2023, the ALJ held a hearing (R. 65–101), and issued a written decision denying her claim on November 14, 2023 (R. 42–56). Although the ALJ found that Robin suffered from several severe impairments—"cervical and lumbar degenerative disc disease, scoliosis, fibromyalgia, and osteoarthritis of the left hand and feet"—she determined that Robin could still perform work at the light level, with additional limitations. (*See generally id.*) Robin appealed that decision, but

the Appeals Council denied her request for review, making the ALJ's written decision the final

word of the Commissioner as of May 29, 2024. (*See* R. 1–4.)

**A.      Legal Framework**

A claimant's RFC is his "maximum remaining ability to do sustained work activities in

an ordinary work setting" for eight hours a day, five days a week, despite her medical

impairments and related symptoms. SSR 96-8p, 1996 WL 374184, at *2 (July 2, 1996)

(emphasis omitted). The ALJ makes the RFC finding between steps three and four of the five-

step disability determination. *See Patterson v. Comm'r of Soc. Sec. Admin.*, 846 F.3d 656, 659 (4th

Cir. 2017) (citing 20 C.F.R. § 404.1520(e)). "This RFC assessment is a holistic and fact-specific

evaluation; the ALJ cannot conduct it properly without reaching detailed conclusions at step

2 concerning the type and [functional] severity of the claimant's impairments." *Id.*

The Commissioner "has specified the manner in which an ALJ should assess a

claimant's RFC." *Thomas v. Berryhill*, 916 F.3d 307, 311 (4th Cir. 2019). First, because RFC is

by definition "a function-by-function assessment based upon all of the relevant evidence of

[the claimant's] ability to do work related activities," SSR 96-8p, 1996 WL 374184, at *3, the

ALJ must identify each impairment-related functional restriction that is supported by the

record, *see Monroe v. Colvin*, 826 F.3d 176, 179 (4th Cir. 2016). The RFC should reflect credibly

established "restrictions caused by medical impairments and their related symptoms"—

including those that the ALJ found "non-severe"—that impact the claimant's "capacity to do

work-related physical and mental activities" on a regular and continuing basis. SSR 96-8p, 1996

WL 374184, at *1, *2.

Second, the ALJ's decision must include a "narrative discussion describing" how specific medical facts and non-medical evidence "support[] each conclusion" in the RFC assessment, SSR 96-8p, 1996 WL 374184, at *7, and logically explaining how he or she weighed any inconsistent or contradictory evidence in arriving at those conclusions, *Thomas*, 916 F.3d at 311. Generally, a reviewing court will affirm the ALJ's RFC findings when he or she considered all the relevant evidence under the correct legal standards, *see Brown v. Comm'r of Soc. Sec. Admin.*, 873 F.3d 251, 268–72 (4th Cir. 2017), and the written decision built an "accurate and logical bridge from that evidence to his [or her] conclusion[s]," *Woods v. Berryhill*, 888 F.3d 686, 694 (4th Cir. 2018), *superseded by Rule on other grounds as recognized in Rogers v. Kijakazi*, 62 F.4th 872 (4th Cir. 2023) (internal quotation omitted). *See Shinaberry v. Saul*, 952 F.3d 113, 123–24 (4th Cir. 2020); *Thomas*, 916 F.3d at 311–12; *Patterson*, 846 F.3d at 662–63.

## B.    Medical Evidence

Between 2018 and 2023, Robin went to over 20 medical appointments to address her chronic pain and, as part of these exams, underwent numerous diagnostic tests. On June 18, 2018, X-rays of her lumbar spine showed levoscoliosis with degenerative changes from L3 to S1, but there was no fracture or significant change from her previous scans on September 30, 2015. (R. 687.)

On May 28, 2019, Robin saw Karen Garrett, a physician assistant ("P.A."), for back pain stemming from past motor-vehicle accidents. (R. 581.) P.A. Garrett noted that Robin "has struggled with anxiety, depression and chronic pain for many years, has tension migraines, [irritable bowel syndrome ("IBS")], and chronic pain syndrome and fibromyalgia." (R. 583.) She diagnosed Robin with IBS, fibromyalgia, migraines, and arthritis of the lumbosacral spine.

(*Id.*) Despite this, Robin's physical exam, mental status, memory, and orientation were all normal. (*Id.*)

On June 18, 2019, Robin had an MRI of the lumbar spine due to her back pain with bilateral leg pain. (R. 500.) The MRI found that there was an "interval increase in degenerative dis[c] disease in the lower lumbar spine particularly at L4-5 and L5-S1." (*Id.*) In addition, at both the L4-5 level and the L5-SI level there were disc protrusions resulting in a narrowing of the foramen and decreased fat surrounding the L4 and L5 roots. (*Id.*) This signified that some degree of nerve root impingement was likely at each of those levels. (*Id.*)

On July 18, 2019, Robin saw Dr. Mark Roy at UNC Health for a neurosurgical evaluation. (R. 478.) Dr. Roy wrote in his notes that Robin reported that her back pain had gotten worse "over the past 6 months with increasing dysesthesias into her lower extremities." (R. 479.) Dr. Roy examined Robin and found "no obvious traumatic deformities" in her back and no evidence of scoliosis. (R. 483.) He found that Robin was at full motor strength, but her reflexes were poor in her knees and absent at the right ankle. (*Id.*) Dr. Roy reviewed Robin's MRI exam, finding that she had degenerative change, rotational deformity, and facet arthropathy worse on the right at L4-5 and on the left at L5-S1. (*Id.*) Dr. Roy diagnosed Robin with lumbar spondylosis and an unspecified type of scoliosis and noted that he would have her exercise and see if that helps. (*Id.*)

Another set of X-rays on the spine done the next day—July 19, 2019—revealed "mild dextroscoliosis of the mid to upper thoracic spine and levoscoliosis of the thoracolumbar junction," though no fracture was found. (R. 603.) The X-rays also showed "minimal though

questionable degenerative dis[c] disease in the mid to upper thoracic spine." (*Id.*) Robin's levoscoliosis was unchanged from her 2018 X-rays. (R. 432.)

In August 2019, Robin saw P.A. Garrett and Dr. Roy for follow-up appointments. (R. 579, 510.) P.A. Garrett noted that Robin reported severe pain despite the home exercises, and that the pain had impacted her balance, causing her to fall several times. (R. 579.) She noted Robin's mental status was depressed, but that she had normal orientation and memory. (R. 580.) P.A. Garrett diagnosed Robin with IBS, fibromyalgia, arthritis of the lumbosacral spine, and degeneration of lumbar intervertebral disc. (*Id.*) Dr. Roy noted that Robin reported improvements from the exercises and that, upon examining her, her strength remained full but knee jerk on the right and ankle jerks were absent. (R. 513.) His diagnoses ultimately remained the same, and his only recommendation was for Robin to continue her exercises. (*Id.*)

Robin saw Dr. Roy and P.A. Garrett again in December 2019. (R. 455, 574.) Dr. Roy reported that Robin was doing "reasonably well" and that "[r]ight now she is stable." (R. 455, 459.) His diagnoses were unchanged. (R. 459.) P.A. Garrett noted that Robin had increased stress due to her mother's declining health and being her mother's primary caretaker, with the stressors causing a recent flare in her fibromyalgia. (R. 576.) P.A. Garrett prescribed Gabapentin and Tramadol for Robin's fibromyalgia and adjusted her anxiety medication. (R. 577.) P.A. Garrett diagnosed Robin with arthritis of the lumbosacral spine, fibromyalgia, IBS, and anxiety disorder. (*Id.*)

Robin saw P.A. Garrett again in January and February of 2020. (R. 571, 567.) P.A. Garrett noted that Robin reported slight improvement with her new medication and that her

mental status was normal, but that Robin had a fibromyalgia flare in February. (R. 573, 569.) Her diagnoses remained unchanged. (R. 574, 570.) Robin had another follow-up appointment with Dr. Roy on March 19, 2020, during which Dr. Roy noted that Robin was having left-sided flank pain when standing and sitting. (R. 446.) Dr. Roy's examination revealed that her strength was normal, with a small amount of tenderness in her latissimus. (R. 450.) His diagnoses remained the same, and he reported that Robin was stable but that her scoliosis "needs to be followed." (*Id.*)

On July 23, 2020, Robin saw Dr. Thomas Ostergard for her back pain and scoliosis. (R. 494.) Dr. Ostergard noted that Robin's lower back pain was dull and paraspinal on the right side, and that she reported sciatic distribution pain that does not radiate into either of her legs. (*Id.*) Dr. Ostergard reviewed Robin's MRIs and noted lateral recess stenosis on the right at L4-5 and on the left at L5-S1, as well as "some severe L5-S1 foraminal stenosis." (R. 498.) Upon exam, Dr. Ostergard found that Robin had "tenderness over the majority of her joints in both upper and lower extremities" and "tenderness all over her back," but "no neurologic symptoms[.]" (*Id.*) In addition, Dr. Ostergard found that her scoliosis appeared "degenerative with a minimal curve" and "likely to progress to a degree severe enough to cause significant symptoms or require operative intervention." (*Id.*) He recommended continued medical therapy, including a facet injection on the left at L4-5, rather than surgical intervention. (*Id.*)

On September 1, 2020, Robin saw P.A. Garrett for a follow-up appointment, reporting a fibromyalgia flare-up, increased back pain, and pain and weakness in her hands. (R. 566.) Robin also reported being stressed with regard to caring for her ailing mother. (*Id.*) P.A.

Garrett diagnosed Robin with anxiety disorder, arthritis of the lumbosacral spine, fibromyalgia, IBS, and migraine. (*Id.*) P.A. Garrett referred Robin to Dr. David Spivey, a pain management specialist, whom she saw on October 7, 2020. (R. 546.) At that appointment, Robin complained of daily joint pain, as well as daily aching, sharp, and shooting back pain. (*Id.*) Robin, however, denied anxiety and depression. (R. 548.) Dr. Spivey examined Robin's spine but did not find evidence of scoliosis or tenderness; he also noted that Robin was able to do lumbar flexion and extension without pain. (*Id.*) Dr. Spivey prescribed physical therapy and lumbar epidural steroid injections and made a referral for a rheumatology evaluation. (R. 549.) Later that month, Dr. Spivey administered a transforaminal lumbar epidural steroid injection on Robin's right at L4-5 and her left at L5-S1. (R. 542.) In November 2020, Dr. Spivey conducted an electrophysiological evaluation of Robin's lower extremities and found them within normal limits. (R. 532.) Robin reported to Dr. Spivey that her back pain improved with the injections. (R. 539.)

On November 18, 2020, Robin saw Dr. Govinda Aryal on referral from Dr. Spivey. (R. 637.) During her initial exam, Dr. Aryal found everything normal except for tenderness in Robin's lumbar spine and paraspinal area, soft-tissue tenderness on the elbow and bilateral upper arm muscles, and her heels. (R. 638.) Dr. Aryal diagnosed Robin with arthralgia, myalgia (likely fibromyalgia), back pain, and osteoarthritis. (*Id.*)

The same day, Robin had another set of X-rays done. (R. 644–48.) An X-ray of her left hand found mild degenerative spurring at the first carpometacarpal articulation, but no other abnormalities elsewhere on either hand. (R. 646.) An X-ray of her spine found 13 degrees of lumbar scoliosis measured between L1 and L5, a partially transitional S1 vertebra, and four

millimeters of degenerative anterolisthesis of L5 and S1. (R. 647.) X-rays of her feet showed minimal lateral spurring of the first metatarsal heads bilaterally and a cystic lesion in her right foot. (R. 648.)

Robin saw P.A. Garrett on January 22, 2021, and reported to her that the injections brought mild relief but that she could not miss work regularly to get them. (R. 563.) Robin returned for a follow-up appointment on May 12, 2021, and reported chronic back pain and migraines, as well as stress from losing her job and taking care of her mother. (R. 559.) P.A. Garrett assessed Robin as having migraines, fibromyalgia, anxiety disorder, and arthritis of lumbosacral spine, and kept her medications the same. (R. 559–60.)

On August 5, 2021, Robin saw Dr. Aryal and for a follow-up appointment. (R. 634.) Robin reported to Dr. Aryal that she experienced pain all over the body, fibromyalgia flares, and stress and anxiety. (*Id.*) Dr. Aryal noted that soft-tissue tenderness and chronic pain in the muscles were consistent with fibromyalgia and an X-ray of Robin's spine showed osteoarthritis. (R. 635.) Her diagnoses for Robin were osteoarthritis, fibromyalgia, and arthralgia. (*Id.*)

Between August 16, 2021, and May 4, 2022, Robin saw P.A. Garrett six times for her IBS, fullness and discomfort in her abdomen, and worsening lower back pain with radiation to the abdomen, pelvic pain, and headaches. (R. 721, 716, 708, 854, 888.) Robin had a few other appointments in early 2022 for her bladder and pelvic issues. (R. 907, 865, 903.)

On August 4, 2022, Robin saw Megan Hudson, a nurse practitioner ("N.P."), and reported that her back pain, fibromyalgia, and headaches were getting worse and disrupting her sleep. (R. 949.) N.P. Hudson noted that Robin was anxious and unable to turn her neck

completely left and right, but that her back showed a normal curvature. (R. 951–52.) The next day, Robin got X-rays of her thoracic and cervical spine. (R. 967–68.) The X-ray of her thoracic spine found no abnormalities, and the X-ray of her cervical spine found "degenerative disc disease and degenerative joint disease" with "moderate disc height loss and degenerative change present at C4/5, C5/6, and C6/7, with mild facet arthropathy." (R. 968.)

On September 20, 2022, Robin saw P.A. Garrett for a follow up and asked for a referral to a pain clinic due to worsening fibromyalgia and chronic back pain. (R. 947.) P.A. Garrett assessed Robin as anxious and depressed and noted tenderness and limited range of motion. (R. 948.) She also noted that Robin stopped getting steroid injections because she "was concerned that they were not good for her and of the side effects." (*Id.*) Her assessment of Robin found that she had degeneration of the lumbar intervertebral disc, arthritis of the lumbosacral spine, anxiety disorder, fibromyalgia, IBS, and migraine. (R. 948.)

An MRI of Robin's lumbar spine performed on October 18, 2022 found an interval progression of degenerative disc disease, with findings most severe at L3-L4 and L4-L5. (R. 962.) L3-L4 showed "moderate to severe spinal canal stenosis and foraminal narrowing," and L4-L5 showed "mild spinal canal stenosis, severe left lateral recess and left neuroforaminal narrowing." (*Id.*)

On January 12, 2023, Robin saw Dr. Eduardo Fraifeld on referral from P.A. Garrett and reported chronic back pain, more constant and severe neck pain, and left leg pain, with the most pain in her lower back and hips. (R. 1129.) Dr. Fraifeld described Robin's mental state as normal. (R. 1131.) Upon examining Robin, Dr. Fraifeld found no pain, tenderness, or swelling on her spine, though he noted stiffness and some discomfort with extension.  (*Id.*)

He also noted no diffuse tenderness consistent with fibromyalgia and that the mild tenderness in a few areas does not meet the diagnostic criteria for fibromyalgia. (*Id.*) Dr. Fraifeld wrote that the exam was "frankly very unimpressive," and while she had some degenerative disc disease on the lumbar spine, he could not get any pain during his "aggressive" exam. (R. 1132.) He opined that "her major issue really is the fibromyalgia," and recommended further monitoring of her symptoms, exercise, a low-dose amitriptyline to help her sleep, and injections if her back pain became worse. (*Id.*)

Between February and May 2023, Robin saw N.P. Hudson three times for follow-up appointments. (R. 937, 935, 929.) At each appointment, Robin complained of pain in various parts of her body and anxiety. (*Id.*) N.P. Hudson assessed that Robin had musculoskeletal tenderness and limited range of motion, but that she was otherwise normal. (R. 939, 936, 932.) At the May 24, 2023 appointment, N.P. Hudson noted that Robin had fibromyalgia, IBS, anxiety disorder, arthritis of the lumbosacral spine, and pain of right elbow joint. (R. 932.)

On June 28, 2023, Robin saw Susanne Washburn, a family nurse practitioner ("F.N.P."), with complaints of right elbow pain. (R. 1127.) Upon examining Robin, F.N.P. Washburn found everything with her right elbow normal except for some tenderness upon palpation. (R. 1128.) She recommended a tennis elbow strap, ice, topical pain creams, and exercise. (*Id.*) Robin declined an injection for her elbow. (*Id.*)

A bone-density scan performed on August 17, 2023, showed that Robin had low bone mass and, as a result, she had a 14% chance of a major osteopathic facture within the next 10 years. (R. 1141.) The report noted, however, that only those patients with a 10-year probability

of a major osteopathic fracture of greater than or equal to 20 percent are recommended to be considered for treatment. (*Id.*)

On August 21, 2023, Robin saw P.A. Garrett for a follow-up appointment to discuss her worsening back and neck pain and her sleep issues. (R. 1137.) Robin also reported worsening anxiety but felt that it was related to her mother's poor health and did not want to adjust her medication. (R. 1139.) P.A. Garrett noted that Robin's mental status was anxious and depressed, and her musculoskeletal examination again found tenderness and limited range of motion; the rest of the physical exam was normal. (*Id.*) P.A. Garrett assessed Robin as having anxiety disorder, arthritis of the lumbosacral spine, fibromyalgia, chronic insomnia, and migraine, and kept her on the same medications. (R. 1140.)

## C.    Opinion Evidence

On initial review of Robin's DIB application, state agency examiners Joseph Duckwall, M.D., and Joseph Leizer, Ph.D., found that Robin suffered several severe impairments— osteoarthritis, disorders of the skeletal spine, and disorders of muscle, ligament, and fascia— but that her migraines, depression, anxiety, neurocognitive disorders, and inflammatory bowel disease were not severe. (R. 115.) Dr. Duckwall noted that Robin "has a normal gait[,]" is able to manage her day-to-day responsibilities and care for her elderly mother, and medication has helped manage her pain. (R. 117–18.) He also found no indication that Robin had to seek emergency treatment or repeated visits to her primary care physicians for her other impairments—acid reflux, insomnia, migraines, and hernia acid—and therefore they were not severe. (R. 118.) Based on these findings, Dr. Duckwall opined that Robin had the RFC to perform "light" work with restrictions on stooping and was therefore not disabled under the

terms of the Act. (R. 120.) Dr. Duckwall found that Robin was able to stand, walk, and sit for "[a]bout 6 hours in an 8 hour workday" and that she should lift no more than 20 pounds. (R. 117.)

As it related to Robin's depression and brain fog, Dr. Leizer opined that although she "may have had high stress," her memory was intact at her last doctor's visit, she stated that her medications are working, and she experienced no hospitalizations or ER visits. (R. 116.) Therefore, Dr. Leizer found that Robin's mental-health allegations were not severe.

Robin appealed and, on reconsideration, state-agency examiners Leslie Montgomery, Ph.D., and Bert Spetzler, M.D., opined that Robin suffered several severe impairments—disorders of the skeletal spine, fibromyalgia, and migraines—but that her gastrointestinal disorders, anxiety and obsessive-compulsive disorders, and other and unspecified arthropathies were not severe impairments. (R. 126.) Dr. Spetzler noted that Robin's neurological exams were normal except for tenderness and that she had "some DDD [degenerative disc disease] in her L spine but normal gait and neg [negative] SLR [straight leg raise]." (R. 128.) He further noted that Robin has IBS but a steady body mass index, that she has never sought emergency care for her migraines, and that she complains of fatigue. (*Id.*) Based on these findings, Dr. Spetzler concluded that "[t]he evidence is consistent with the ability to perform light work," but "due to valid chronic pain and fatigue complaints associated with lumbar DDD and fibromyalgia[,]" Dr. Spetzler reduced her RFC to "light with stand/walk limited to 4/8 hours with protection from HA [headache] triggers." (*Id.*) Accordingly, Dr. Spetzler found that Robin could occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk for a total of four hours in an eight-

hour workday, and sit for "[a]bout 6 hours in an 8 hour workday." (*Id.*) Dr. Spetzler included

additional limitations: that Robin "[m]ust periodically alternate between sitting and standing

to relieve pain and discomfort," and that she requires "freedom to alternate sit/stand/walk

for at least 5 minutes every hour and 15 minutes every two hours[.]" (*Id.*)

As for her brain fog and depression, Dr. Montgomery found that Robin's "only current

dx [diagnosis] is anxiety for which she is prescribed Lexapro." (R. 127.) She noted that her

mental-status examinations were all within normal levels or "only significant for anxious mood

and/or affect." Further, her memory was also within normal levels and that there were "no

objective findings of confusion or difficulty with speech/word-finding." (*Id.*) Based on these

findings, Dr. Montgomery opined that the evidence was "consistent with no more than mild

functional limitations." (*Id.*)

## D.    Relevant Testimony

In a function report submitted in support of her application, Robin averred that her

fibromyalgia and back condition cause constant pain, especially when sitting and standing. (R.

276) She stated that the pain makes her unable to sleep more than three to four hours each

night and that she can do only light work around the house and essential outings. (R. 276–77).

Further, Robin averred that her migraines and lack of sleep have caused brain fog and an

inability to concentrate. (R. 276, 278.)

At a hearing before the ALJ, Robin testified that she was let go at her place of

employment, Virginia Glass, on April 5, 2021, because she had fallen twice at work due to her

back pain and leg weakness and was falling asleep at her desk due to her insomnia. (R. 74–75.)

She testified in further detail about her back pain, particularly that it started 25 to 30 years ago

and has progressively gotten worse, and that, as a result, she can stand only for 10 to 15 minutes at a time. (R. 78–79.) Robin also testified that she has "so much brain fog" to the point that she "can't remember anything." (R. 90.) With regard to her anxiety, Robin stated that she continues to deal with anxiety, that she has "problems even getting a deep breath," and that she takes Zoloft. (R. 101.)

A vocational expert also testified and opined that, given the hypotheticals and limitations posed by the ALJ, Robin could not perform the receptionist job she had at Virginia Glass because it would qualify as a work environment with a noise level above three, but that she can generally perform her past relevant composite work as a receptionist and insurance clerk. (*See* R. 106–08.) On cross examination, Robin's counsel added several limitations to the hypotheticals posed by the ALJ: the need to regularly change positions and take regular breaks to walk around, only occasional handling and fingering on the left, and unskilled work. (R. 108–09.) The vocational expert answered that with those limitations, only about nine percent of jobs allow those types of frequent breaks and that Robin would not be able to do her past relevant work. (*Id.*)

**E.    The ALJ's Opinion**

In the operative decision, the ALJ concluded that Robin suffered from: "cervical and lumbar degenerative disc disease, scoliosis, fibromyalgia, and osteoarthritis of the left hand and feet."[1] (R. 44.) She found that Robin did not suffer from "an impairment or combination

---

[1] The ALJ also determined that Robin's other issues—"hiatal hernia; gastroesophageal reflux disease; irritable bowel syndrome; migraines; bladder, vaginal, and uterine prolapse; and age-related cataracts and ischemic optic neuropathy of the right eye," as well as her mental impairments of depression and anxiety—were medically determinable impairments, but they were not severe enough to render her disabled. (R. 46.) Robin challenges this determination as to her depression and anxiety, migraines, and blurred vision. She argues that the evidence

of impairments" that met or medically equaled one of the listed impairments in the applicable

regulations. (R. 47.) "After careful consideration of the entire record," the ALJ found that

Robin had the RFC

> to perform light work as defined in 20 CFR 404.1567(b) except
> standing/walking 4 hours in an 8-hour workday; should never
> climb ropes/ladders/scaffolds or crawl; occasionally climb ramps
> and stairs, balance, stoop, knell, and crouch; capable of frequent
> handling and fingering on the left; should avoid concentrated
> exposure to extreme cold, humidity, vibration, pulmonary
> irritants (such as fumes, gases, odors, dust, and poor ventilation),
> and hazards including moving machinery and unprotected
> heights; can have occasional exposure to noise, and should not
> work in an environment with a noise level above 3.

(R. 48.) As a result, the ALJ found that Robin was "capable of performing past relevant work

in a composite job comprised of a receptionist and insurance clerk[,]" as those jobs "do not

require the performance of work-related activities precluded by [Robin's] residual functional

capacity." (R. 54.) Therefore, Robin was not under a disability from April 5, 2021, through the

date of her decision. (R. 55.)

### III.    ANALYSIS

Robin challenges the ALJ's opinion on three grounds. First, she contends that both the

ALJ's finding that her "depression and anxiety are non-severe impairments" and the ALJ's

RFC findings "are not supported by substantial evidence." (Pl.'s Br. at 21.) Second, Robin

argues that the ALJ's findings that certain physical impairments were not severe and that

diagnostic testing for cervical and lumbar disc disease have yielded minimal findings are not

---

of record shows that these impairments significantly limit her ability to perform work activities and, therefore,
the ALJ's determination that they are non-severe impairments is not supported by substantial evidence. (Pl.'s
Br. at 21, 24–25.)

supported by substantial evidence; Robin also challenges the ALJ's RFC findings and analysis. (Pl.'s Br. at 24–28.) Third, Robin contends that the ALJ's decision finding her allegations inconsistent with the medical evidence "is not supported by substantial evidence and should be rejected as insufficient." (Pl.'s Br. at 28.) Because this court finds the ALJ's RFC analysis as to Robin's mental impairments was insufficient and is thus a basis for remand, it will not reach Robin's other arguments.

Here, the ALJ determined that Robin did not have any severe mental limitations at Step Two. Rather, she determined that Robin's mental limitations were non-severe and that she had mild limitations in the functional areas of "understanding, remembering or applying information," "interacting with others," "concentrating, persisting, or maintaining pace," and "adapting and managing oneself." (R. 46.) A non-severe impairment is generally not "expected to interfere with the individual's ability to work, irrespective of age, education, or work experience." *Evans v. Heckler*, 734 F.2d 1012, 1014 (4th Cir. 1984). Robin challenges the characterization of her mental impairments as non-severe, as well as the ALJ's RFC findings as to her mental impairments. (Pl.'s Br. at 21–23.)

A.  The ALJ did not err by finding Robin's mental impairments non-severe.

As for the non-severe characterization, Robin argues that the "evidence of record documents [her] complaints of severe anxiety and depression that are impacted by her physical pain" and "significantly limit her ability to perform work activities." (Pl.'s Br. at 21.) Therefore, she asserts, the ALJ's finding is not supported by substantial evidence. (*Id.*)

An ALJ must use a "special technique" when determining if a claimant has a severe mental impairment. *Patterson v. Comm'r of Soc. Sec. Admin.*, 846 F.3d 656, 659 (4th Cir. 2017).

Under this special technique, the ALJ must make "a specific finding as to the degree of limitation" in each of the four areas of functional limitation listed in 20 C.F.R. § 404.1520(e). *Id.* (quoting 20 C.F.R. § 404.1520(e)(4)). In other words, the ALJ must determine the extent to which the mental impairment interferes with her ability to function. "A rating of 'none' or 'mild' generally calls for a conclusion that the impairments are not severe unless the evidence indicates more than a minimal limitation in the claimant's ability to do basic work activities." *Kimberly J. v. O'Malley*, No. 7:22-cv-704, 2024 WL 1885571, at *8 (W.D. Va. Mar. 8, 2024).

The ALJ acknowledged that Robin's depression and anxiety were medically determinable mental impairments, noting Robin's "anxious and/or depressed mood during mental status examinations" and her statements that "she does not handle stress well" and has trouble concentrating. (R. 46.) And though the ALJ's explanations for her findings for each functional area were cursory, the ALJ sufficiently discussed the evidence pertaining to each functional area and why she concluded that they were mild:

> The first functional area is understanding, remembering or applying information. In this area, the claimant had a mild limitation. In her Function Report, the claimant stated that she does not need any special reminders to take care o[f] personal needs or grooming but does use a weekly pill organizer to remind her to take medications. The claimant had normal recent and remote memory during mental status examinations.

> The next functional area is interacting with others. In this area, the claimant has a mild limitation. In her Function Report, the claimant stated that she does not have any problems getting along with family, friends, neighbors, or others. The claimant had anxious and/or depressed mood during mental status examinations.

> The third functional area is concentrating, persisting or maintaining pace. In this area, the claimant has a mild limitation. In her Function Report, claimant stated that she can pay attention for 30 minutes and does not finish what she starts. The claimant was alert and oriented times three during mental status examinations.

> The fourth functional area is adapting or managing oneself. In this area, the claimant has a mild limitation. In her Function Report, the claimant stated that she does not handle stress or changes in routine well. The claimant had good insight and judgement during mental status examinations.
>
> Because the claimant's medically determinable mental impairments cause no more than "mild" limitation in any of the functional areas <u>and</u> the evidence does not otherwise indicate that there is more than a minimal limitation in the claimant's ability to do basic work activities, they are non-severe.

(R. 46 (internal citations omitted).) Here, the ALJ clearly considered the four functional areas, discussing reports from Robin's doctors assessing her mental state during appointments and Robin's own statements in her Function Report. *See, e.g.*, *Kimberly J.*, No. 7:22-cv-704, at *9. Moreover, the ALJ's assessment was consistent with the medical records—which demonstrate, as a whole, that Robin presented with normal mental status and reported that her stress and anxiety were often situational to her mother's failing health—as well as the conclusions by state agency examiners who found her mental impairments non-severe. Accordingly, the ALJ's finding that Robin's mental impairments are not severe is supported by substantial evidence.

B.    <u>The ALJ failed to consider Robin's mental impairments in her RFC analysis.</u>

As for the ALJ's RFC findings, Robin argues that the ALJ did not explain how her mild limitations in all four functional areas "are addressed or accommodated" by the RFC findings, and that the ALJ merely recited evidence and stated her conclusions "without explanation as to how she arrived at her findings." (Pl.'s Br. at 22.) The Commissioner argues that the ALJ was not required to say more in her RFC assessment. (Def. Br. at 11.) Robin has the better argument here.

"[E]ven when a mental impairment is properly found to be nonsevere, the ALJ must consider the extent to which the impairment and any related symptoms impact the claimant's ability to perform more specific work-related functions . . . under ordinary workplace conditions." *Cynthia W. v. Saul*, No. 5:18-cv-102, 2020 WL 2090677, at *4 (W.D. Va. Apr. 30, 2020); *see also Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015) ("To make [an RFC] assessment, the ALJ must consider all of [the claimant's] medically determinable impairments of which [the ALJ is] aware, including those not labeled severe at step two." (cleaned up) (second and third alterations in original)). Under Social Security Ruling 96-8p, "[t]he mental RFC assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment" than the analysis under steps two and three by "itemizing various functions . . . of the adult mental disorders listings." 1996 WL 374184, at *4 (July 2, 1996).

The ALJ acknowledged that her Step Two functional area analysis and findings of mild limitations "are not a residual functional capacity assessment but are used to rate the severity of mental impairments at steps 2 and 3 . . . . The mental residual functional capacity assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment." (R. 46–47.) Despite recognizing this distinction between the two steps, the ALJ only briefly mentioned Robin's brain fog and stress in her RFC analysis, and she failed to mention Robin's depression and anxiety disorder, both of which she had concluded were medically determinable impairments. *See Ashcraft v. Colvin*, No. 3:13-cv-417, 2015 WL 9304561, at *9 (W.D.N.C. Dec. 21, 2015) (noting that while the ALJ acknowledged that the step-two analysis "is not a substitute for a thorough and specific RFC review" and that RFC review requires a

"more detailed assessment[,]" the ALJ did not incorporate a "more detailed assessment" in his written decision).

The few times the ALJ includes mental impairments in her discussion were in the context of Robin's severe physical impairments. (*See, e.g.*, R. 49 ("The claimant testified that fibromyalgia is an issue, she aches and hurts all the time all over her body, it affects her sleep, and she has a lot of brain fog."); R. 50 ([I]n September 2022 . . . she also reported worsening brain fog with a fibromyalgia flare associated with stress."); R.51 ("[T]he claimant was assessed with . . . fibromyalgia flared due to stress and worsening brain fog"); R. 52 (stating that Robin's fibromyalgia is "accompanied by memory problems and brain fog"); *id.* (stating that Robin reported an increase in tension headaches and "that life was stressful").) Accordingly, the ALJ's explanation of her RFC conclusions focuses almost exclusively on Robin's physical impairments, except for one mention of brain fog. Specifically, in explaining the workplace limitations placed on Robin, the ALJ noted her fibromyalgia flares, migraines, osteoarthritis of the left hand, and musculoskeletal tenderness as the bases of these limitations, with no mention of Robin's anxiety or depression. (*See* R. 54.) Importantly, the ALJ did not address how Robin's anxiety and depression "might affect her ability to do the basic work-related activities required of her prior relevant work." *See Dolly H. v. Kijakazi*, No. 2:22-cv-573, 2023 WL 6566603, at *7 (S.D.W. Va. Aug. 31, 2023).

The ALJ's failure to discuss Robin's anxiety and depression in her RFC analysis requires remand because she failed to "build an accurate and logical bridge from the evidence to [her]

conclusion[,]" thereby frustrating meaningful review.[2] *See Monroe v. Colvin*, 826 F.3d 176, 188–89 (4th Cir. 2016); *Dolly H.*, No. 2:22-cv-573 at *6 (noting that while courts in the Fourth Circuit "have not agreed on whether an ALJ's failure to discuss in the RFC analysis the work-related effects of mild limitations[,]" the common thread throughout the Circuit is that "remand is required when the ALJ's decision, taken as a whole, is insufficient to allow for meaningful review"). Perhaps the ALJ considered Robin's mental limitations in crafting her RFC and limitations, but her lack of explanation as to how these limitations affect Robin's RFC leaves this court to "guess at how the ALJ arrived at [her] conclusions[.]" *Mascio*, 780 F.3d at 637. Without a more thorough analysis of this issue, the court cannot accurately determine whether Robin's denial was consistent with the law and applicable regulations. Remand is required.

## IV.    CONCLUSION

For the foregoing reasons, the court will remand this matter to the Commissioner for further proceedings consistent with this Opinion.

The Clerk is directed to forward a copy of this Memorandum Opinion and the accompanying Order to the parties.

---

[2] The Commissioner relies on *Britt v. Saul*, 860 F. App'x 256 (4th Cir. 2021), in arguing that the ALJ did not have to address Robin's mild mental limitations. The quote from *Britt* the Commissioner relies on is: "The discussion in step-two that these limitations had a minimal impact on vocation and were being managed tells us what impact these limitations had in the residual-functional-capacity analysis." *Id.* at 262. But the court noted that "[i]t is unclear whether an administrative law judge must specifically address a claimant's *mild* impairment in concentration, persistence, or pace in the residual-functional-capacity analysis." *Id.* at 262 n.3 (emphasis added). Here, the ALJ found that Robin had mild impairment in all four functional areas. (R. 46.) Therefore, the Commissioner's argument is unpersuasive.

**ENTERED** this 23rd day of September, 2025.


/s/ Thomas T. Cullen
HON. THOMAS T. CULLEN
UNITED STATES DISTRICT JUDGE